UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 26-cv-13058 |
| Plaintiff, | |
| v. | COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF |
| HOPPER (USA), INC., a corporation, and | |
| HOPPER INC., a corporation, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action for Defendants' violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Commission's Rule on Unfair or Deceptive Fees ("Fees Rule"), 16 C.F.R. pt. 464. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and the Fees Rule, 16 C.F.R. pt. 464.

**SUMMARY OF THE CASE**

2.      Defendants Hopper (USA), Inc. and Hopper Inc. (together, "Defendants") operate mobile apps that, among other things, allow consumers to book airfare, short-term rentals (including hotel rooms and vacation homes), and rental cars. Yet, as Defendants' own internal documents make clear, the real money for Defendants comes not from travel bookings, but rather from deceiving consumers through misrepresentations, bait-and-switch practices, and hidden fees.

1

3.     Indeed, Defendants' business practices have been so rife with deception that Defendants' own employees have repeatedly raised the alarm. For example, one employee complained that "the problem here is that we're tricking users." Another employee "forgot to turn off the toggle" for the hidden fees while making a purchase on Defendants' app and complained that they "felt 'cheated' by Hopper."

4.     Despite these and other complaints, including numerous consumer complaints, Defendants refused to make changes to comply with the law.

5.     Defendants freely acknowledge that their bottom line critically depends on their unlawful conduct. For example, in response to concerns expressed by one employee that the companies were tricking consumers, Defendants internally acknowledged that they needed the hidden Tip fee because it was a "meaningful percentage of our gross profit" and needed the hidden VIP Support fee because it was "literally 100% of the gross profit that our air business derives." Defendants continued their illegal practices because complying with the law would cost them profit.

6.     Through their illegal practices, Defendants have caused consumers tens of millions of dollars in harm.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(2), (c)(3), and 15 U.S.C. § 53(b).

## PLAINTIFF

9.     The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.

15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC further enforces the Fees Rule, 16 C.F.R. pt. 464, which prohibits unfair or deceptive practices involving fees or charges for live-event tickets and short-term lodging, including: (a) failing to disclose, every place price is displayed, the "total price" (i.e., the maximum total of all fees a consumer must pay for any good or service and any mandatory ancillary good or service, with limited exceptions); (b) failing to disclose the nature, purpose, and amount of fees or charges and the identity of goods or services for which fees are imposed; and (c) misrepresenting the nature, purpose, amount, and refundability of fees or charges and the identity of the good or service for which a fee is imposed.

## DEFENDANTS

10.     Defendant Hopper (USA), Inc. ("Hopper (USA)") is a Delaware corporation with its principal place of business at 265 Franklin Street, Boston, Massachusetts. Hopper (USA) is a wholly owned subsidiary of Defendant Hopper Inc. Hopper (USA) transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Hopper (USA) has advertised, marketed, distributed, or sold its products and services to consumers throughout the United States.

11.     Defendant Hopper Inc. is a closely held Canadian corporation with its registered office at 5795 Ave. de Gaspé, Montreal, Quebec. Hopper Inc. is the sole owner of Hopper (USA). Hopper Inc. transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Hopper Inc. has advertised, marketed, distributed, or sold its products and services to consumers throughout the United States.

## COMMON ENTERPRISE

12.    Defendants have operated as a common enterprise while engaging in the unfair and deceptive acts and practices and other violations of law alleged below. Defendants have conducted the business practices described below as an integrated business through interrelated companies that have common officers, directors, managers, and employees; unified advertising; and shared business functions such as a shared customer relations management database and shared customer service agents. Because Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

13.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES
### A. DEFENDANTS OFFER BOOKING SERVICES FOR THIRD-PARTY TRAVEL AND THEIR OWN ADD-ON TRAVEL PRODUCTS

14.    Defendants offer booking services for third-party travel through their Hopper apps and, to a limited extent, on their website.

15.    Defendants' initial offering on the Hopper apps, in 2015, was an airfare price prediction service. Later that year, Defendants began offering booking services for air travel. Defendants then added booking services for other types of travel through the Hopper apps, including hotel stays in 2019, car rentals in 2020, and vacation home stays in 2022.

16.    In connection with marketing and selling travel bookings, Defendants also market and sell their own add-on travel products, including Price Freeze and VIP Support. These add-on products purport to provide consumers with travel flexibility, or fast, timely customer service.

4

17.    Defendants began marketing and selling Price Freeze in 2019 and VIP Support in 2020.

18.    Defendants charge variable fees for Price Freeze and VIP Support that are based on factors such as the type and cost of the underlying travel booking. For example, the fees for Price Freeze have been based on the cost of the underlying booking. The fees for VIP Support have ranged from $10–$42 for air travel, $9–$25 for hotel stays, and $9 for car rentals.

### B. DEFENDANTS HAVE DECEPTIVELY HIDDEN AND UNFAIRLY CHARGED CONSUMERS FOR FEES WITHOUT CONSUMERS' EXPRESS INFORMED CONSENT

*Defendants Deceptively Advertise That Hopper's Prices Have No Hidden Fees and Include All Fees*

19.    To induce consumers to use their travel booking services, Defendants have disseminated or caused to be disseminated advertisements that contain the following statements and depictions, among others:

**Figure 1 – Hopper Website Ad for Hopper's Travel Booking Services [dated Apr. 13, 2026; representing: "Hopper is completely free to download and doesn't have any hidden fees or gotcha charges."]**

**Is Hopper free to use?**

Hopper is completely free to download and doesn't have any hidden fees or "gotcha" charges. We're passionate about helping our customers find the best travel deals.

**Figure 2 – Hopper Mobile Ad**
**[dated June 8, 2021; representing: "Hopper – the travel app with no hidden fees"]**



**Figure 3 – Hopper Digital Ad**
**[dated Apr. 4, 2024; representing: "No hidden fees . . . 100% free"]**

20. Defendants have also routinely advertised Hopper's travel booking services online using the taglines "No Hidden Fees on Hopper," "No Hidden Fees," "Zero Hidden Fees," "no more hidden fees," "Compare car rentals without the hidden fees. Just transparent pricing,"

6

and "Transparent Pricing Always," including in search advertising, Android and iOS app store advertising campaigns, and other digital advertising campaigns on Google, Facebook, TikTok, Snapchat, Twitter, Pinterest, and other channels.

21.     In a similar vein, Defendants have represented that their "prices include all fees":

**Figure 4 – Hopper In-App Hotel Stay Ad**
**[dated July 15, 2025; red oval added; representing: "Prices include all fees"]**



*Defendants Have Misrepresented the True Cost of Their Services By Adding Hidden Fees and Charging Consumers Those Fees Without Consumers' Express Informed Consent*

22.     Contrary to Defendants' representations that Hopper's prices have no hidden fees or "gotcha" charges and include all fees, Defendants have routinely charged consumers hidden or

"gotcha" fees. Further, these fees have not been included in advertised prices. Thus, contrary to Defendants' representations, the advertised prices do not "include all fees."

23.    Defendants have charged consumers who book travel through Hopper hidden fees without the consumers' express informed consent. Specifically, Defendants have charged consumers the "Tip" fee and for the VIP Support customer service product, both without consumers' express informed consent. These fees were hidden, preselected, and were not included in advertised prices for Defendants' air travel, rental car, and short-term lodging bookings.

24.    For example, from 2020 to late 2023, consumers booking a flight on Defendants' apps would view the following screens near the end of their transaction:

**Figure 5 – Screenshots from Hopper App Airfare Purchase Flow
[dated Jan. 24, 2022; personal information redacted]**



8

25.     On the Choose Payment screen (leftmost screenshot above), Defendants display the "Total" price of the booking, here $997.85. After the consumer selects "Continue," Defendants display the Review Details screen (center screenshot). In the visible portion of the Review Details screen, a consumer is told to "Swipe to Book Flight." If a consumer does so, Defendants send the booking to the third-party travel provider for completion, and the consumer is shown the "Pack your bags!" screen (rightmost screenshot).

26.     However, a consumer who "Swipe[s] to Book Flight" without scrolling down would unknowingly be charged more than the "Total" price because the consumer would also be charged two hidden, preselected fees.

**Figure 6 – Screenshots from Hopper App Airfare Purchase Flow
[dated Jan. 24, 2022; red ovals added; personal information redacted]**



[visible portion of screen]          [scrolled down]          [scrolled down further]

9

27.    Only if a consumer scrolled down further on the Review Details screen, as shown in the "scrolled down" screenshot, would the consumer see that they were also agreeing to pay $3.00 for an "optional" tip that had been preselected by Hopper. And only if the consumer scrolled even further down, as shown in the rightmost screenshot, would the consumer see that they were also agreeing to pay $25.00 for VIP Support that had also been preselected by Hopper.

28.    Not only did Defendants charge consumers for Tip and VIP Support without clearly and conspicuously disclosing the fees throughout the Hopper travel booking purchase flow, but Defendants also failed to provide any indication, much less an adequate disclosure, that fees would be charged at all or that scrolling down was required to view them. Thus, given the language of Defendants' advertisements and their travel booking purchase flow, a reasonable consumer who "Swipe[d] to Book" would have believed they were being charged for the booking only, and not also being charged undisclosed Tip and VIP Support fees.

29.    Furthermore, in numerous instances, Defendants charged Tip and VIP Support fees when the consumer swiped to book their travel, even if the underlying travel booking was not confirmed by the third-party travel provider. And in numerous instances, Defendants did not refund the Tip and VIP Support fees if the consumer later cancelled the booking, even when it was cancelled within any free cancellation window permitted by the third-party travel provider, or if the third-party travel provider cancelled the booking. Instead, Defendants retained the Tip and VIP Support fees and refunded them only if consumers noticed and specifically requested a refund of each fee by name.

30.    Defendants were well aware that consumers did not know they would be charged the hidden fees. Consumers routinely complained to Defendants about the deceptive and unfair

nature of the Hopper travel booking purchase flow that resulted in the consumers being charged hidden fees.

31. Defendants' customer relationship management database contains numerous communications from 2021 through at least mid-2024 from consumers reflecting their surprise at the amount they were charged when they "Swipe[d] to Book." These consumers said they did not know they would be charged Tip and VIP Support fees, they did not authorize the fees, and they did not understand the nature or purpose of the fees. For example:

| | |
|---|---|
| 2021-01-29 | **Customer:** "I did not intend to buy the VIP support. Honestly it feels like ya'll snuck that in on the final screen at the bottom and opted me in. I would like it removed from both of the flights I just purchased, as well as the Tip that was also auto opted in for" |
| 2021-04-27 | **Customer over multiple messages:** "Hi, I've ordered two flights and both times a $14 fee was tacked on to my flight. I did not authorize these two charges. I would like them removed. . . . Going forward, how do I stop this from happening? Is it a button I should click?"<br><br>Hopper: "Good question. Before swiping to pay, there is an option for your [sic] to opt\-out from Hopper Tip and VIP support fee." |
| 2021-12-31 | **Customer:** "Hi I need you to refund the vip support and tip for hopper those were unauthorized charges the [sic] were enabled green by default so I did not accept the charges refund those immediately" |
| 2022-10-26 | **Customer over multiple messages:** "Remove and refund charge for VIP service which I did not authorize . . . I did not authorize a Hopper tip either . . . How did these charges occur . . . I have purchased with Hopper before but this kind of default setting for the VIP service charge and tip is manipulative" |
| 2022-11-09 | **Customer over multiple messages:** " I didn't mean to get VIP support. Can i get a refund for that? . . . One comment, on the app, you see the swipe to purchase and it blocks the option for VIP service so i didn't even see it as an opy [sic] . . . Option" |
| 2023-02-08 | **Customer over multiple messages**: "I DID NOT request VIP support, but you charged my credit card for it. . . . Also why was I charged for a TIP to Hopper. I DID NOT authorize this or was told about it before I booked my room." |

| | |
|---|---|
| 2023-02-09 | **Customer:** "I am extremely frustrated because I was charged $25 for 'VIP Support' when finishing up my flight booking, and this was a charge I did not see. The app allowed me to click through to 'confirm payment'" without requiring me to scroll down to the bottom of the screen. If I had been blocked from paying until I saw that purchasing VIP support was opted in to by default, I would not have purchased it" |
| 2023-06-26 | **Customer**: "Could you kindly provide an explanation regarding the purpose of the 'tip' mentioned on the receipt? I have no recollection of authorizing or purchasing this tip, but I have noticed it on the receipt since you brought it to my attention. I presume that the application has an automatic default setting to include the hopper tip?" |
| 2023-10-01 | **Customer:** "i was also charged five dollars for a tip and $15 for VIP support? Those are hidden fees that I had no idea I was being charged!" |
| 2024-02-13 | **Customer:** "As I asked earlier, I have a one dollar charge on my company credit card. In addition to the flight charge. What is that charge for?" <br> ***** <br><br> **Hopper:** "I have observed that **$1** was charged for Tip. . . ." <br><br> **Customer over multiple messages:** "So is it a service fee? Why was I charged on top of the price quoted?" <br><br> **Hopper:** "No, It is not a service fee. Upon checking that you have tipped Hopper at the time of booking." |
| 2024-02-26 | **Customer over multiple messages:** "I checked on Hopper and it said $213 . . . It never said on Hopper app that I would have to pay more than the actual price. . . . Can you see what was charged? 262.10-253.94 is not 34.40" <br> ***** <br><br> **Hopper:** "Sure, Hopper VIP support fee USD25.00 and Hopper TIP USD5.00 was also added to the original reservation hence USD253.94 was charged in total" |
| 2024-03-25 | **Customer over multiple messages:** "Ok but I got charged extra $5 for no reason . . . You never addressed the $5 extra charge . . . I never agreed to tip . . . Anywhere . . . There's no proof that I selected that and paid for it" |
| 2024-04-05 | **Hopper in response to customer voicemail:** "we're sorry for any inconvenience you've experienced. I've processed the refund for the $5 tip" |
| 2024-04-24 | **Customer over multiple messages who was charged for Tip, VIP Support, and another add-on travel product:** "I booked a flight from Denver to Montgomery and now they are hitting my card with all these charges[.] I want all these extra charges removed and put back on my card 34.00 5.00 78.00[.] I only wanted to purchase my flight for 367.00 nothing else" |
| 2024-05-12 | **Customer:** "I've just noticed I had vip support for this booking but I didn't select it" |

12

32.    Defendants also monitored online consumer reviews of their Hopper apps that, in numerous instances, reflected consumer complaints about hidden Tip and VIP Support fees. For example, an internal presentation entitled "Q4 2022 App Review Sentiment" analyzed and discussed negative consumer reviews about the Tip and VIP Support fees. The slides indicated that "29% of [negative] reviews call Hopper a scam as they dispute charges or [they] name charge as fraudulent" and quoted many reviews, such as the following dated October 30, 2022:

> Extremely shady app. On the last step of your flight purchase, the 'TIP' option, which starts from $5 and up to 15% of your ticket value, and a $15 VIP support, are automatically checked[.] The best part You won't see the total price at this screen, unless you scroll down to the bottom and double check the total amount and detail before swipe to pay. I won't be surprised tons of use[r]s just 'tipped' them without even noticed [sic]. This App should be reported and take[n] down.

33.    As alleged above, Defendants internally acknowledged that their profit and success depended on charging consumers these hidden, preselected fees.

34.    Defendants have charged consumers millions of dollars in Tip fees each year, including approximately $6,028,019 in 2021, $8,382,831 in 2022, and $3,560,825 in 2023.

35.    Defendants have charged consumers millions of dollars in VIP Support fees each year, including approximately $12,927,157 in 2021, $30,298,788 in 2022, and $24,388,192 in 2023.

*Defendants' Employees Repeatedly Raised Concerns About the Unfair and Deceptive Fees*

36.    As noted above, on multiple occasions, Defendants' employees acknowledged in internal communications that the Hopper app user interfaces often led consumers to pay Defendants' hidden, preselected Tip and VIP Support fees without the consumers' express informed consent.

37.     For example, in an October 6, 2022 internal communication, an employee acknowledged that Defendants, in an effort to survive the COVID-19 pandemic, designed the user experience ("UX") to create confusion (i.e., an "anti-pattern"):

> Recently, I forgot to turn off the toggle in my own reservation, and like my friends who've previously complained of this feature when I recommend them to use Hopper, felt "cheated" by Hopper. It seems like we're well beyond the point of surviving covid when this optional fee was turned auto-on (a UX anti-pattern for something that brings the user negative functional value).

38.     As another example, one of Hopper's principal software engineers referenced the hidden fees in a July 15, 2021 chat with a Hopper customer experience manager and said, "I'm struggling to see how we view this as anything but deceptive UX [user experience]." The engineer also noted, "I know Designers have repeatedly had their concerns ignored on this front."

39.     The customer experience manager then raised the engineer's concerns with a Hopper manager for business and data strategy and a Hopper data scientist. After reading the engineer's concerns, the data scientist responded, "[W]elcome to the club."

40.     In a December 9, 2021 internal communication, employees raised various concerns about the hidden, preselected Tip and VIP Support fees, including the following:

- [I]'ve been seeing more frustrated comments about toggled on vip and specifically the tip over the last weeks. I know from time to time we come back to this topic, but I wanted to ask if there are any plans to revisit this and consider a different UX (not toggling on automatically)? At least the tip since the customer doesn't really get any value in return.

- It seems pretty off that we need a quantitative metric to say we shouldn't charge users more than the price they were last shown, but . . . [.]

- How do we justify the tip here in regard of our Hopper tenets? [The employee then quotes from Hopper's "Merchandising Tenets":]

  > 3. Add value and not fees. We generate revenue through providing goods and services that customers value and gladly pay for – not through added fees or markups on the underlying travel products.

14

Seems like the tip is straight up a fee, which we try to avoid.

- [I]t's just common sense that no one would like to have something added to a purchase automatically (at least not me), especially when it's not in their benefit (and I'm talking specifically about the tip cause I said on my original message is the one that concerns the most since the end customer doesn't really get any value from it). And we can't blame it on the customer for "not checking" or "not scrolling". [W]e should start from the principle that customers trust our product and for that reason they should be able to Swipe to Pay without looking for "hidden fees", because they shouldn't expect to get anything added unless they were the ones who made the decision to add.

- To me, the problem here is that we're tricking users. Any data about future behavior is going accurately [sic] reflect what's best for the user. There's a good chance that users don't notice they were over charged, and are still happy with their experience, but that still does not mean it's ok.

- I like the ideas for doing things more clearly, but I know over 30 employees who have been trying to fix this UX dark pattern for over 2 years. The suggestions feel a little empty in the face of all the users we are overcharging.

- I was also really disappointed to see that experiment [an experiment forcing users to scroll down to see the Tip and VIP Support fees before being able to Swipe to Pay] turned off. I think the opt-out tip and VIP support [sic] has always been one of my biggest internal concerns since starting at Hopper.

- Every other ancillary we have [i.e., Hopper's add-on products, services, and fees] is opt-in and clearly is able to show our users how it will benefit them. Why is tip/VIP support any different? We have been getting negative app reviews for years because of this (and I have even had personal anecdotes from friends, which feels horrible). Is it a significant number of users that care about the extra charge? Maybe not, but that doesn't make it the right thing to do by our customers.

  If I am not mistaken, we are now experimenting with VIP support pricing with it going up to $25. That's a $30 opt-out on the last screen without even forcing the user to look at the total increase before swiping to pay.

- I know VIP benefits our users a lot, but if it really makes that much of a difference then why are we having such a problem having users opt-in? If it is so valuable, is there a reason we can't give it to everyone and build it into our pricing? At least then we will be transparent about it. If we are making Hopper the cheapest place to buy, why are we opting our users into a $5 tip at the very end of shopping?

15

41.     Through 2022, employees continued raising concerns about the hidden, preselected Tip and VIP Support fees. For example, in an August 31, 2022 chat, a Hopper customer service manager stated: "settings for VIP and Tip are defaulted in the app and quite often, the Customers don't notice it." A Hopper senior software engineer replied: "yes I'm aware that this is a common scenario, and there has been some debate about the default settings for these amongst the product/engineering teams."

*Defendants' Own Internal Testing Illustrates the Deceptive and Unfair Nature of the Apps' Booking Flow and Defendants' Knowledge of the Same*

42.     Defendants' internal testing showed that the Tip and VIP Support fees were deceptively hidden and reinforced Defendants' knowledge that, if they adequately disclosed the Tip and VIP Support fees and made them unselected by default, most consumers would not pay them. For example, Defendants conducted:

- A 2018 Mandatory Booking Service Fee vs. Tip experiment that showed that only 15% of consumers would affirmatively choose to pay a disclosed and unselected Tip fee, compared to 25% of consumers who paid a disclosed, preselected Tip fee; 75% of consumers who paid a hidden, preselected Tip fee; and 8% of consumers who would affirmatively choose to pay a hidden, unselected Tip fee. As a result of this experiment, Defendants decided to change the mandatory booking service fee to a hidden and preselected Tip fee;

- A 2021 Tip and VIP Support experiment in which the screen displayed "the swipe button only after the user has scrolled down enough to see the toggle controls [i.e., the preselected Tip and VIP support fees]," the results of which were: "[w]e took a big hit on Revenue" and "[w]e're losing $3+" in revenue per transaction. Consequently, Defendants did not adopt this user interface;

- A 2023 Tip experiment that showed, as of May 9, 2023, if Defendants changed the Tip fee from preselected to opt-in, the number of consumers who affirmatively chose to pay the Tip fee was "predictably low, down about 90% across the board with Hotels having the highest propensity to Tip when the toggle is off, at 4% of customers tipping." Defendants did not adopt this user interface;

- A May 2023 VIP Support fee experiment that showed that requiring consumers to opt in to VIP Support lowered the conversion rate from 37% to

16

5.57% for air and from 19% to 2.6% for hotels. Defendants did not adopt the opt-in user interface and instead maintained the preselected user interface; and

- An August 2023 VIP Support fee experiment that showed that revealing a preselected VIP Support fee for air lowered the conversion rate from 36.6% when it was hidden and preselected to: 15.7% when it was revealed within the booking flow and preselected; 4.7% when it was on a pop-up screen and preselected; 1.8% when it was revealed and an opt-in was offered; and, finally, to 1.17% when it was revealed but Basic (free) support was preselected.

43.    Discussing the above 2023 Tip experiment, on May 1, 2023, a Hopper manager for business and data strategy noted the significant drop in conversion rate for an unselected, disclosed Tip (i.e., a "Voluntary Tip") versus when it was "ON by default": "Voluntary Tip attach rate is just 0.75% as opposed to 43% [attach rate] with it ON by default."

44.    On May 16, 2023, a Hopper customer service manager discussed more specific results of the 2023 Tip experiment by category of travel service, including that making the Tip fee unselected by default reduced the number of consumers who paid the Tip fee for air travel by 98%, for hotel stays by 80%, and for car rentals by 93%.

45.    On August 17, 2023, a Hopper customer service manager opined that changing VIP Support from preselected to opt-in would result in a loss of $6.60 in air revenue per transaction, "not factoring in the loss of revenue coming from lower air conversion due to forced choice, which was -13% (air only) – it's material."

46.    In late 2023, Defendants rolled back some of the temporary compliance steps they had taken, which had included suspending the fees, because of the costs involved. Specifically, Defendants resumed charging the preselected Tip and VIP Support fees but relocated the fees to above the fold.

17

## C. DEFENDANTS HAVE FAILED TO DISCLOSE MATERIAL INFORMATION ABOUT THE PURPORTED "TIP"

47.    Until late 2018, Hopper charged a mandatory $5 service fee on each booking transaction. Around the end of 2018, Defendants conducted internal consumer behavior testing that compared the existing mandatory $5 service fee to four variations where the fees were: (a) hidden (i.e., below the visible screen) and preselected; (b) disclosed (i.e., on the visible screen) and preselected; (c) disclosed and opt-in; and (d) hidden and opt-in. The testing showed that changing the mandatory $5 service fee to a hidden, preselected fee would double conversion rates. Consequently, around the end of 2018, Defendants relocated the $5 service fee below the visible screen, preselected it, and renamed it "Tip."

48.    In 2023, Defendants moved the preselected "Tip" fee to the end of the purchase flow. The discussion to move Tip to the end of the purchase flow began in or around April 2023 when Hopper's hidden, preselected Tip was receiving undesired attention from outside sources. For example, in May 2023, the *Wall Street Journal* approached Hopper regarding an article the newspaper was going to write involving the Hopper Tip. In response to this inquiry, an employee wrote to a Hopper customer service manager, "We're really getting hit from all directions on this tip stuff."

49.    Around the same time, Hopper discussed alternative ways of marketing Tip without losing too much revenue, and explored moving Tip to the booking confirmation screen but keeping it preselected by default.

50.    On May 19, 2023, a Hopper customer service manager discussed with a Hopper customer experience project manager "the right approach" for a new Tip screen design at the end of the purchase flow. One proposal included three specified amount options ($1, $5, and $9), with $5 preselected, and a "No thanks" option that would allow consumers to opt out of paying

18

the Tip fee. In response to a suggestion to remove the "no thanks" option, the customer experience project manager stated: "That seems like a very sub-par experience to me. . . . it's not very intuitive." The customer service manager agreed: "I think that skirts the territory of hidden fees too closely for now. Let's start with the secondary CTA [call to action] of 'no thanks' and go from there." As alleged below, however, Defendants ultimately decided against providing a "No thanks" option that would more clearly and conspicuously disclose the optional nature of the Tip fee, and the method by which the consumer could decline to pay it.

51.    In the flow that Defendants did implement, after a consumer selects the "Swipe to Book" travel button, Defendants present consumers with screens substantially similar to Figure 7, below. The first screen says: "Please keep the Hopper app open as our bunnies confirm your booking!" The next screen then says: "A confirmation email will be sent shortly to [email address]."

**Figure 7 – Screenshots from End of Hopper In-App Hotel Stay Purchase Flow
[dated Sept. 30, 2025; personal information redacted]**



52.     The Tip screen presents three pre-populated tip amounts of $1, $5, and $9. There is no option for consumers to select a $0 Tip. Nor does the Tip screen otherwise disclose to a consumer that they can decline to Tip, the method for doing so, or that declining to Tip has no impact on the processing of their transaction.

53.     Defendants charge the Tip fee to the same payment method the consumer selected to pay for the booking. Defendants do not disclose the Tip fee or its nature and purpose, including its optionality, elsewhere in the travel booking flow, including before a consumer consents to pay for the booking.

54.     Unbeknownst to many consumers, if a consumer does not wish to Tip, they may press the "X" in the upper left-hand corner of the Tip screen (Figure 7, above). But reasonable

consumers may not notice this "X" or understand its purpose even if they do notice it. Indeed, in a chat about moving the Tip to the end of the purchase process, a Hopper employee expressed this concern. In the May 19, 2023 chat described above in Paragraph 50, the customer service manager asked if Hopper should just use an "X instead [of] no thanks?" The customer experience project manager disagreed: "I'd be inclined to give them the second opt-out CTA, in case the X isn't obvious."

55.    In addition, as depicted in Figure 7, above, when consumers select the "Swipe to Book" travel button, Hopper tells consumers on one screen to "keep the Hopper app open as our bunnies confirm your booking" and on the next screen (i.e., the Tip screen) that the "confirmation email will be sent shortly." A reasonable consumer could interpret these screens to suggest that their booking has not yet been completed and that selecting the "X" would cancel their entire booking transaction, not simply close the Tip screen.

### D. DEFENDANTS HAVE MISREPRESENTED CONSUMERS' ACCESS TO AND THE AVAILABILITY OF VIP SUPPORT

56.    In addition to charging consumers for the VIP Support product without their express informed consent during the booking process, Defendants have also misrepresented the attributes of VIP Support in their advertising.

57.    As alleged above, Defendants have marketed and sold VIP Support, a paid customer service product, since 2020.

58.    Defendants have claimed that VIP Support guarantees consumers customer service instantly or within a specified time such as 5 or 10 minutes.

59.    To induce consumers to purchase VIP Support when they need timely customer service, such as when they encounter a problem during their travel, Defendants have

disseminated or caused to be disseminated advertisements that contain the following statements

and depictions, among others:

**Figure 8 – Hopper In-App Pop-Up Ad for VIP Support in Trip Summary
[dated Dec. 6, 2022]**

[Excerpted Text] **1 out of 3 flights to Seattle need urgent support**[.] Your booking has Basic Support – You may be waiting **for up to 48 hours** for a response. Skip the line and get priority support[.] Get a guaranteed response within 5 minutes[.] Upgrade to VIP Support – US$25.00 [or] No, I won't need urgent assistance[.]



**Figure 9 – Hopper In-App Ad for VIP Support**
**[pops-up when consumers click the "Get Help" link; dated Jan. 30, 2023]**

[Excerpted text] Support Level: Basic[.] You have Basic Support for this trip. Requests will be responded to via email within 24 hours[.] Want to skip the line? Upgrade to VIP Support to chat with an agent instantly.



60.     Contrary to Defendants' representations that consumers who purchased VIP Support would be able to reach an agent "instantly" or within "minutes," consumers who purchased VIP Support were often unable to reach a customer support agent at all or had to wait substantial amounts of time in order to do so.

61.     For example, consumers submitted the following complaints to the Federal Trade Commission:

| 2023-08-07 | "[T]ried to get in touch with Hopper through calling and paid for VIP support and cannot get through to anyone." |
|---|---|
| 2023-04-22 | "When I received my receipt, I saw that I was charged $25 per ticket for 'vip customer service.' Turns out Hopper offers no customer service at all. For the $25, you can send a chat. 40-60 minutes later, someone will reply with an auto message that doesn't answer your question or say they can't help. There is no phone number. There is no way to elevate or get your request heard -- you just get a worthless auto message. I also was charged $5 as a 'tip.' Why would I tip a platform that offers no customer service?" |

23

| 2023-02-11 | "I have no way to contact [VIP Support] they have no contact number and when you message them no one responds[.]" |
| 2022-12-14 | "When we got to the hotel to check-in, we were told that hopper had booked regular rooms for us instead of the suites we purchased. I reached out to the VIP support for help, and couldn't get any type of response leaving us without any help resolving the issue." |

62.     In addition, Defendants' internal analysis of their own consumer complaint database acknowledges that there is "Poor Customer Support"; that consumers find it  "Hard to reach CS when [they] need help"; and consumers experience even "More frustrations when [they] purchase VIP and still don't get timely help." [Bracketed text added.]

63.     Even Defendants' own employees complained about the lack of timely VIP Support, such as on December 29, 2022 when an employee posted to Defendants' #hotels-general Slack chat: "Wondering if anyone know [sic] what's the best way to get support for a hotel reservation? I'm trying to reach out through VIP support but haven't gotten a response after 45 min."

64.     Defendants' deceptive representations about consumers' access to and the availability of VIP Support were material because they were likely to influence a reasonable consumer's decision to purchase VIP Support in addition to the Basic Support that was already included in the price of the booking.

### E. DEFENDANTS HAVE MISREPRESENTED THE ATTRIBUTES OF PRICE FREEZE

65.     Defendants have marketed and sold Price Freeze, also marketed as Hold the Room, since at least 2019 as a product that allows consumers to hold or freeze an advertised price for a travel booking for a period of time so a consumer can book the travel later for the same price.

24

66.   To induce consumers to purchase Price Freeze, Defendants have disseminated or caused to be disseminated advertisements that contain the following statements and depictions, including Figures 10–13, among others:

- "Hold this fare . . . Book later when you're ready";

- "Freeze Flight Deals With Just a Deposit";

- "[T]he price freeze tool allows you to keep the prices from increasing";

- "If the price increases, you'll pay the price you see now";

- "Book your frozen flight to use your deposit within 7 days, otherwise it will expire"; and

- "With Hopper's Price Freeze feature you can lock in the best rate for an extended period of time. That gives you time to think about your trip and make a decision if you want to book it. If the price increases, you pay at the price you locked in at."

**Figure 10 – Hopper In-App Ad for Price Freeze During Air Travel Booking Process [dated Mar. 19, 2024; representing: "Hold this fare, starting at $28[.] Book later when you're ready"; red oval added]**



**Figure 11 – Banner Ad for Hopper**
**[representing: "Freeze Flight Deals With Just a Deposit"]**



**Figure 12 – Screenshots from Hopper YouTube Ad**
**[representing: "And if you're not quite ready to book, the price freeze tool allows you to keep the prices from increasing"; initially posted March 14, 2023, captured Apr. 4, 2024]**



**Figure 13 – Hopper YouTube Ad for Price Freeze**
**[initially posted Sept. 29, 2021]**

[Audio] With Hopper's Price Freeze feature you can lock in the best rate for an extended period of time. That gives you time to think about your trip and make a decision if you want to book it. If the price increases, you pay at the price you

locked in at. If the price decreases, you pay the lower price and get your deposit back.



67.    Contrary to Defendants' representations that Price Freeze holds and freezes the price of a travel booking and is a deposit on the booking:

- Price Freeze will only protect a consumer from a booking's price increase up to a certain amount and if the booking is still available; and

- The Price Freeze fee is not a deposit on the booking (i.e., it is not an amount applied toward the total price of the booking when travel is later booked).

*Defendants Protect Price Freeze Consumers from Price Increases Only up to a Certain Amount and Only if the Booking Is Still Available*

68.    If a consumer purchases and exercises a Price Freeze for a travel booking, Defendants will protect the consumer from a booking's price increase only up to a certain amount (the "Price Freeze Cap" or "Savings Cap"). Separately, if another person purchases the particular booking that is subject to the consumer's Price Freeze, the consumer cannot exercise

their Price Freeze option. Neither material term or limitation is adequately disclosed to consumers.

69.    Many of Defendants' Price Freeze advertisements do not reference any material limitations, restrictions, or exclusions associated with a consumer exercising their Price Freeze option during the Price Freeze window.

70.    In numerous instances, Defendants did not adequately disclose the Price Freeze Cap. For example, numerous advertisements simply refer to Price Freeze as freezing or locking in prices, or keeping prices from increasing, without limitation:

- "And if you're not quite ready to book, the price freeze tool allows you to keep the prices from increasing";

- "Freeze Low Prices on Flights and Hotels"; and

- "If the price increases, you pay at the price you locked in at."

71.    In numerous other instances, as set forth in Figures 14 and 15, below, Defendants have disclosed the Price Freeze Cap only after a consumer has accepted the initial offer making the Price Freeze claim, but have buried the disclosure among a scattering of other disclaimers, rendering the disclosure inadequate.

**Figure 14 – Screenshot of Hopper In-App Initial Offer for Price Freeze**
**[dated May 22, 2025; representing: "Hold this fare" and "Book later when you're ready"]**



72.     Only after the consumer selects "Price Freeze" are they shown the following:

**Figure 15 – Screenshots of Hopper In-App Second Screen for Price Freeze**
**[dated May 22, 2025; after consumers select "Price Freeze" in Figure 14, red ovals added]**



73. It is only on this second screen, in de-emphasized, normal font, that Defendants qualify they will "cover the difference up to $300 per traveler."

74. Thus, if the cost of the travel booking increases more than the Price Freeze Cap ($300 per traveler) during the Price Freeze period, then the consumer who purchased the Price Freeze has to pay any difference between the Price Freeze Cap and the increased cost of the booking. Defendants fail to adequately disclose this material term and limitation.

75. Further, Defendants fail to disclose or disclose adequately that Price Freeze does not reserve or hold a booking during the Price Freeze window. If another person purchases the particular booking that is subject to the consumer's Price Freeze, the consumer cannot exercise their Price Freeze option even if it is within the Price Freeze window. In that case, the consumer who purchased the Price Freeze has to make a separate, new booking, if one is available, that is not covered by the Price Freeze.

76. Defendants fail to adequately disclose the above material term and limitation on securing bookings through Price Freeze. Again, it is only after a consumer has selected Price Freeze and proceeded to a second screen that Defendants qualify, in normal font among other brighter colored and emphasized fonts, that "Freezing the price doesn't reserve the flight." And this cryptic disclosure is insufficient, even if it were disclosed earlier and more prominently, because it is unclear and does not reasonably inform a consumer that if another consumer purchases the booking which is subject to the Price Freeze, the Price Freeze is ineffective.

77. Defendants' misrepresentations about the scope and limitations of Price Freeze are material because they are likely to influence a reasonable consumer's decisions to purchase Price Freeze, when to complete a travel booking, and whether to book through Hopper.

*Defendants Misrepresent that the Price Freeze Fee Is a Deposit on the Travel Booking*

78.    When Defendants first started offering Price Freeze, Defendants operated Price Freeze as a "Deposit Model": Defendants applied the cost of the Price Freeze paid by consumers to the underlying travel booking. At different times from mid-2022 to late 2023 (depending on the type of travel booking), Defendants began operating Price Freeze as a "Fee Model" and stopped applying the cost of the Price Freeze to the underlying booking, thereby retaining the fee.

79.    For example, Defendants stopped operating Price Freeze as a "Deposit Model" for air travel and began operating it as a "Fee Model" around March 24, 2022, and began operating Price Freeze for hotel stays as a "Fee Model" around December 7, 2023.

80.    However, even after changing Price Freeze to a Fee Model, in numerous instances, Defendants have continued to represent that the Price Freeze fee is a "deposit" applied to the cost of a booking. For example, since March 24, 2022, Defendants have represented in advertisements for air travel:

- "Buy now, pay later. $35 deposit, pay 7 days later";

- "Book your frozen flight to use your deposit within 7 days, otherwise it will expire. Your deposit can only be applied to your frozen flight";

- "Lock in your flight for a small deposit and pay later"; and

- "Lock in your flight to New York City for a small deposit and pay later."

81.    Since December 7, 2023, Defendants also have represented in advertisements for hotel stays: "Lock in your hotel room with just a deposit. Freeze your price and pay later!"

82.    Defendants made the above and similar representations well after Defendants switched their Price Freeze product from a Deposit Model to a Fee Model for air travel in 2022

31

and for hotel stays in 2023. In reality, the payments are fees that consumers pay on top of the booking price, are nonrefundable in most instances, and are not deposits.

*Consumers Complained to Defendants About Price Freeze*

83.    Defendants have been well aware that they have misrepresented Price Freeze and failed to disclose, or disclose adequately, its terms, restrictions, and limitations to consumers.

84.    For example, in early 2022, Defendants reported persistent consumer complaints made to customer service representatives expressing dissatisfaction with Price Freeze "due to low availability and hitting the price cap."

85.    As another example, in or around May 2023, an internal document titled "Fee Awareness" discussed Defendants' "Business Problem" that consumers did not understand that Defendants had changed the Price Freeze fee from a deposit to a nonrefundable fee.

86.    Defendants' "Fee Awareness" document summarized the results of multiple consumer surveys showing widespread consumer confusion with respect to Price Freeze's terms. The surveys found that a majority or significant minority of consumers did not understand several Price Freeze limitations, including that the Price Freeze fee was no longer a deposit, that Price Freeze had a price cap, and that the Price Freeze fee was nonrefundable. For example, Defendants' research showed that:

- After Defendants changed Price Freeze from a Deposit Model to a Fee Model, "a year later both old and new customers think that Price Freeze is a deposit. This leads to significant customer frustration with approximately 50% of our CS contact rate coming from fee vs deposit confusion."

- 62% of consumers did not understand that there was a price cap on Price Freeze.

- 45% of consumers incorrectly thought that the Price Freeze fee was refundable.

87.   Defendants eventually added an ambiguous statement that "Fee will not apply to the price of the ticket" to the second screen displayed to consumers after they select Price Freeze (*see* Figure 15, above).

88.   Despite Defendants' awareness of widespread consumer confusion, in numerous instances, Defendants continued to misrepresent that Price Freeze will protect the consumer from any increase in price and that the fee paid for Price Freeze is a deposit.

## VIOLATIONS OF THE FTC ACT

89.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

90.   Acts or practices are unfair under Section 5(a) of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

91.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Defendants' Unfair or Deceptive Fee Practices

### Count I
### Unfairly Charging Consumers Fees
### Without Obtaining Express Informed Consent

92.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of travel bookings, including through the means described in Paragraphs 19 to 46 above, Defendants have charged consumers hidden, preselected fees without obtaining consumers' express informed consent, including:

    A.  "Tip" fees; and

33

B.  VIP Support fees.

93.    Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

94.    Therefore, Defendants' acts or practices as described in Paragraph 92 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count II**
**Misrepresentations About Fees and Charges**

95.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' travel booking services, including through the means described in Paragraphs 19 to 46 above, Defendants have represented, directly or indirectly, expressly or by implication that:

A.  Hopper's offered, displayed, or advertised price for a travel booking is the total price consumers will pay for the booking and includes all fees; and

B.  Consumers will not be charged any hidden fees or "gotcha" charges in connection with a Hopper travel booking.

96.    In fact, in numerous instances:

A.  Hopper's offered, displayed, or advertised price for the travel booking was not the total price consumers paid for the booking and did not include all fees because it did not include the hidden, preselected "Tip" and VIP Support fees Defendants have imposed on the transaction; and

B.  Consumers have been charged hidden fees or "gotcha" charges, specifically preselected "Tip" and VIP Support fees, in connection with Hopper travel bookings.

97.     Therefore, Defendants' representations as described in Paragraph 95 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III
### Failure to Disclose Material Information About the Tip Fee

98.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' travel booking services, including through the means described in Paragraphs 47 to 55 above, Defendants have represented, directly or indirectly, expressly or by implication, that consumers can pay a tip of $1, $5, or $9.

99.     In numerous instances when Defendants have made the representation set forth in Paragraph 98, Defendants have failed to disclose or disclose adequately to consumers the nature, purpose, amount, and optionality of the "Tip" fee, including that consumers can decline to pay the "Tip" fee or can pay a $0 "Tip." This additional information would be material to consumers in their conduct regarding or use of Defendants' travel booking services, including whether to pay the "Tip" fee.

100.    In light of the representation described in Paragraph 98, Defendants' failure to disclose or disclose adequately the material information as described in Paragraph 99 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Defendants' Misrepresentations About Their Add-On Products**

**Count IV**
**Misrepresentations About VIP Support**

101.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of their VIP Support product, including through the means described in Paragraphs 56 to 64 above, Defendants have represented, directly or indirectly, expressly or by implication, that VIP Support guarantees consumers customer service instantly or within a specified time such as 5 or 10 minutes.

102.    In fact, in numerous instances, consumers who purchase VIP Support have not received customer service instantly or within a specified time such as 5 or 10 minutes.

103.    Therefore, Defendants' representations as described in Paragraph 101 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count V**
**Misrepresentations About Price Freeze**

104.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their Price Freeze product, including through the means described in Paragraphs 65 to 88 above, Defendants have represented, directly or indirectly, expressly or by implication, that:

A. Price Freeze protects consumers from any increase in the price of a booking; and

B. The Price Freeze fee is a deposit on the price of a travel booking.

105.    In fact, in numerous instances:

36

A. Price Freeze protects consumers from an increase in the price of a booking only up to a cap; and

B. The Price Freeze fee is not a deposit on the price of a travel booking.

106. Therefore, Defendants' representations as described in Paragraph 104 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TRADE REGULATION
## RULE ON UNFAIR OR DECEPTIVE FEES

107. The Rule on Unfair or Deceptive Fees ("Fees Rule"), promulgated by the Commission under Section 18 of the FTC Act, 15 U.S.C. § 57a, became effective on May 12, 2025, and remains in full force and effect. The Fees Rule is codified at 16 C.F.R. pt. 464.

108. Defendants are "businesses" that offer, display, or advertise prices of short-term lodging, a "covered good or service" as defined by the Fees Rule, 16 C.F.R. § 464.1.

109. Section 464.1 of the Fees Rule provides that "total price" means, in pertinent part, "the maximum total of all fees or charges a consumer must pay for any good(s) or service(s) and any mandatory ancillary good or service."

110. Section 464.2 of the Fees Rule provides, *inter alia*, that it is an unfair and deceptive practice and a violation of the Fees Rule "to offer, display, or advertise any price of a covered good or service without clearly and conspicuously disclosing the total price," and it requires businesses to disclose clearly and conspicuously, before the consumer consents to pay, "[t]he nature, purpose, and amount of any fee or charge imposed on the transaction that has been excluded from total price and the identity of the good or service for which the fee or charge is imposed."

37

111.     Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of any rule promulgated under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(1)(B).

112.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Fees Rule also constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count VI
### Failure to Clearly and Conspicuously Disclose the Nature and Purpose of the Tip Fee

113.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' short-term lodging booking services, including through the means described in Paragraphs 47 to 55 above, Defendants have represented, directly or indirectly, expressly or by implication, that consumers can pay a tip of $1, $5, or $9.

114.     In numerous instances when Defendants have made the representation set forth in Paragraph 113, Defendants have failed to clearly and conspicuously disclose to consumers the nature, purpose, and amount of the "Tip" fee at the end of the purchase flow, including that consumers can decline to pay the "Tip" fee or can pay a $0 "Tip."

115.     Therefore, Defendants' representations as set forth in Paragraph 113 constitute unfair and deceptive practices that violate Section 464.2(c) of the Fees Rule, 16 C.F.R. § 464.2(c), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### CONSUMER INJURY

116.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the Fees Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**CONSUMER REDRESS**

117.    Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the Fees Rule. This relief may include, and is not limited to, rescission or reformation of contract, and the refund of money or return of property.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the Fees Rule;

B. Award monetary and other relief within the Court's power to grant; and

C. Award any additional relief as the Court determines to be just and proper.

Dated: July 2, 2026

Respectfully submitted,

FOR THE FEDERAL TRADE COMMISSION:

/s/ Karen J. Mandel
Karen J. Mandel, Esq. (NY 2841948)
Edwin Rodriguez, Esq. (DC 446457)
Esther J. Lee, Esq. (WA 63356)
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, D.C. 20580
Tel.:       (202) 326-2491 (Mandel)
            (202) 326-3147 (Rodriguez)
            (202) 326-2633 (Lee)
Email:     kmandel@ftc.gov
           erodriguez@ftc.gov
           elee4@ftc.gov